Good morning, Your Honors. My name is Andy Fitz, Assistant Attorney General for the State of Washington. I'll take the next 14 minutes for opening arguments. Mr. Robinson Dorn, representing the initiative sponsors, will take the next five minutes of opening. We'll reserve six minutes for rebuttal. We'll split that three minutes, or six minutes. Your Honors, Congress put states in the lead of hazardous waste regulation, and it made the federal government subject to that regulation just like everyone else. And as shown through the Federal Facility Compliance Act amendments to RCRA, even when hazardous waste is mixed with Atomic Energy Act radioactive material, Congress struck a deliberate balance between state and federal authority that preserves state authority over hazardous waste and checks federal power. We're here for two reasons today. First, we believe that Initiative 297 regulates within the balance struck by Congress. Second, we believe that the positions taken by the federal government and adopted by the district court threaten to change Congress's balance. If you read the initiative as we urge, the initiative is constitutional. And if you disagree with our reading, we still ask that you reverse holdings by the district court that are overbroad and unnecessary to resolve this case. I'll focus on three areas today. First, preemption. Second, the Commerce Clause. And third, the Contract Clause. With respect to preemption, the district court held that Initiative 297 is field preempted by the Atomic Energy Act. There are two completely separate issues here. The first concerns application of the initiative's mixed waste provisions. The second concerns the one section of the initiative that does directly regulate radiation safety. That's section 5 sub 1 that dictates cleanup standards for radioactive releases. With respect to the mixed waste provisions, we're not asking the court to overrule the Washington State Supreme Court. We accept how the Washington State Supreme Court construed the definition of mixed waste in the initiative. Our argument focuses on a completely different issue. It's how that definition is taken and then applied through the substantive operative provisions that relate to mixed waste under the initiative. Are you saying, in effect, that the state can voluntarily choose not to exercise power, which the statute appears to grant it? We're saying that as we read the statute, it doesn't directly regulate. And you read the statute as the Washington Supreme Court has read the statute. I'm not sure that you can say we accept the Washington Supreme Court decision, which I think you have to say, and then say, but we're going to read it more modestly than they have, and we can decide to curtail our authority voluntarily. I'm not sure that is that what you're saying. What we're saying is something slightly different. The way we read the Washington State Supreme Court's decision is that it confined its analysis to looking at the definition itself. In fact, the language of the decision itself states, we confine our answers to determining whether the CPA definition of mixed waste, the definition of mixed waste, expands the scope of regulated materials beyond the Hazardous Waste Management Act and RFRA. So what you're saying is that you take a position that you take that definition and then look at it in some contextual manner? You take it and you look at it as it gets applied through the operative provisions. What the Washington State Supreme Court did is analogous to looking at CERCLA and saying, what universe of materials does the CERCLA hazardous waste definition capture? Well, it captures anything that's a hazardous substance. It could be in a product. It could be in the stream of commerce. It could be in an infinitesimally small amount. But when that definition is actually taken and applied through the operative provisions of CERCLA, it only has effect with respect to material that's released and in a sufficient quantity to pose a health threat. Well, the Washington Supreme Court had this case in front of it. The definitions it was offering up, it was offering up in the context of a certified question in this case, right? And the certified question went to looking at the definition. We have the other side says, well, basically, if you accept the Washington Supreme Court definition, then you in effect agree that there's preemption. And I know that your briefs don't quite say that. But now you're talking in the abstract, so let me get more specific. As I read your brief, you're saying you take the Washington Supreme Court definitions and then you have to run them through the limitations imposed on the state by RCRA. Am I correct on that? You're very close. Okay. Can you speak closer? Okay. What we're saying is that when you look at those operative mixed waste provisions, there are two different ways to read them. One is that it creates basically three permitting requirements. You have to get a permit under the Hazardous Waste Management Act, under RCRA, and under the initiative. The other way to read them is to say we interpret the reference to those three to all conditions how Washington applies its hazardous waste authority. In other words, the initiative, instead of applying directly, points over to another law and tells the Department of Ecology how to regulate mixed waste under that other law. Okay, so let's separate there. Do you agree that under RCRA that the state has authority only to regulate hazardous, I don't want to confuse waste or substance, as opposed to radioactive? I do agree. I agree that under RCRA, Atomic Energy Act radionuclides are excluded from the scope of solid waste. Okay, and solid waste, of course, leads to this scenario of things. So if the nuclear materials are excluded from state regulation under RCRA and your brief says you don't need to go any further than regulating under RCRA, then what does the initiative do, read in that context? What the initiative does, read in that context, is within the whole range of discretion that ecology has in how to implement its hazardous waste authority, the initiative says implement it in these certain ways. In other words, in your hazardous waste permit, if it's an interim status facility that is noncompliant and has releases, put a condition in that permit that says no further waste from outside the facility until the facility is cleaned up. But that waste means no further waste, including nuclear waste? No, it means waste within the jurisdiction of the Hazardous Waste Management Act. So is there anything they can't do that now? No, there isn't. So in other words, if I rewrote the initiative and instead of every time it said mixed waste, I put a little bracket in there and said substituted waste subject to regulation under RCRA, would that comport with the state's position? In the way we read it, yes. Because let me illustrate this by pointing out the problem with the other way you could read it, which is to say when you read section 4 sub 2 and it says get permits under these three authorities, it means permits under three authorities. It would say not just a permit under the initiative authority, but it would require a mixed waste facility, as broadly as you want to define that, to get a permit from the federal government under RCRA. That is impossible. A mixed waste facility could not get that permit from the federal government when RCRA has no jurisdiction over the facility or the material it handles. So it's an absurd consequence of reading it that expansively. The way to read it that harmonizes those three references is to read them in relation to Ecology's existing authority under the Hazardous Waste Management Act. What do you say about the fact that the Act gives a private right of action? So even if the Department of Ecology decided to limit its enforcement, there couldn't be a private lawsuit to require extensive enforcement. There could be a private lawsuit, but that lawsuit would only be able to require actions that are within the scope of the authority provided by the initiative. In other words, it's analogous to a citizen suit. But don't you basically gut the initiative? The whole policy and purpose of this is what is perceived to be the bollocks situation at Hanford, the inability to comply with all the various cleanup regimes, and the citizens' understandably frustrated effort to try to do something about additional nuclear waste. That's really what the initiative is about. But you just said we could, in effect, rewrite the statute that would excise all the radioactive issues. We believe that there's, and this gets into our issue of fuel preemption, the state already applies hazardous waste authority that touches on the bulk of the circumstances at Hanford because the radioactive material, by and large, is mixed with hazardous waste. We argue we have legitimate authority over hazardous waste that is not fuel preempted. Even if in exercising that hazardous waste authority, it has an incidental effect on DOE's management of radioactive material. Go ahead. We have two questions. Why not simply exercise that authority? Why are we here? That's what we're arguing that the initiative does. You're telling us the initiative is unnecessary, so why are we here? I'm not saying it's unnecessary. I'm saying that the citizens of Washington chose to focus ecology's authority. Let's get on the same page here. You're telling us that the same authority through other statutes would permit ecology to do this. You're also saying ecology has to be forced by the citizenry by pulling the gun of this initiative to actually exercise the authority. You're representing ecology, so you're telling us your client can do it anyway. Why are we here? We're here because the citizens, and I'm representing both. Fine. We don't care about the citizens in terms of why it is ecology decides to do something. Ecology gets the word. The citizens want us to enforce it. Why haven't you gone out and enforced it based on the other statutes? Apparently, the citizens disagree with how ecology has implemented its authority, and this initiative is intended to do that. But the initiative was four years ago or three years ago. You had plenty of time to enforce the other statutes to accomplish the same end, if that's what you could do. You made any effort to do that? With all respect, because of the district court's ruling, we felt that we were precluded from taking those other steps. No, the district court didn't preclude you from operating under HWMA, RCRA, and the FFCA, did it? The way we read the district court's opinion, and this is one of the reasons we're here today, it says even if we agree with Washington's construction of how the initiative operates, even if it is actually hazardous waste authority being applied, it would still be preempted because of an improper purpose and because of having direct and substantial effects. Let's stop, because one of the difficulties is that, in general, we like to, through the courts, give deference to the purpose when people enact an initiative. They have something in mind here, a legitimate view in mind. The question then is, does that collide with federal preemption under the AEA? So, as I hear you, you're saying basically, well, we don't really care what the people said, we're just going to interpret it a different way. So what is the position, and I understand the Attorney General's kind of, you have to represent the people of the state of Washington, and you're representing the Department of Ecology. Might there not be a conflict in this case? We don't believe so, and let me give you the illustration. Your Honors, what our Supreme Court has said is that the best place to look for voter intent is the language of the statute and the official voter's pamphlet. The official voter's pamphlet here indicates, the Department of Ecology would be directed to regulate mixed hazardous and radioactive waste, facility owners and operators would be required to obtain final facility permits under state and federal hazardous waste laws. The Department of Ecology would be directed not to issue final permits unless certain conditions are provided. Department of Ecology would be directed not to issue or modify permits, again, unless certain conditions were satisfied. The voter's pamphlet is square on with the way we are arguing the initiative should be construed today. But there's no requirement now under RCRA or HWMA to get a final facility permit. There is, actually. And at Hanford, what has happened is, because of the scale of compliance problems, not all of the particular units in the facility have gained those final status conditions. This is saying, before you give that final status to those individual units, certain conditions have to be met. But what the Act does is to add a condition. That is, you can't get a final permit until you... you have to cease the importation of nuclear waste in order to get a final permit. As a condition for encouraging compliance and cleanup. That's not in the law now. That is not in the law now, outside of the initiative. That's right. So the initiative has that impact on the operation at Hanford. That's correct. Ecology could impose the same conditions through its existing hazardous waste authority, but this initiative is telling Ecology, you have no choice but to implement that condition. I'm going to give you more time so you can keep going and answering the questions, and I'm not going to take it out of your colleague's time, just so he can sit more comfortably in his seat there and not get too anxious. So, following up on Judge Schwarzer's question, first a preliminary question. I didn't actually read the new...the CPA as giving additional permitting authority to the Department of Ecology. Is that correct? I don't believe it gives additional permitting authority. I think it says within your existing authority, here are certain things you need to do, and you don't have a choice about them. Okay, so now you're saying that under existing permitting authority, the Department of Ecology could say that they will not accept any more shipments until certain conditions are met. You could do that under existing authority? I believe we could do that under existing authority, yes. We might need the people on the benches to move in. I think we have some additional visitors coming. Thank you. So, your position is that under existing authority, the Department of Ecology could say no, in effect, to incoming shipments that include radioactive components. If ecology is directing its authority at the hazardous waste component... But they haven't done that. They have not done that. It hasn't been tested under federal law. That's correct. And that's the issue before us. That is the issue before you. Because ours would be basically saying it's not a question of discretion. If we read the initiative as enacted by the citizens, it's a mandatory directive to the Department of Ecology that incoming shipments, if they include radioactive waste, which puts them in the definition of mixed waste, you have to put up the stop sign. Is that correct? That's correct. Could they do that without doing that for all hazardous waste materials? I mean, if you single out mixed waste, because it happens to contain some nuclear materials, isn't that suggesting the regulation is aimed at the nuclear materials? I think the regulation is aimed at facilities that, first, as a factual matter, I'm not aware of any facilities that manage mixed waste that also take on pure hazardous waste streams. I don't care whether it's the same facility, because it seems to me if the state throws up a stop sign at its borders for mixed materials and does not do so for hazardous materials generally, if the state's authority is limited to the hazardous materials, that suggests the stop sign isn't really aimed at the hazardous materials. It's aimed at the kind that contain nuclear components or radioactive components. My answer to that is that these are provisions enacted given the fact that mixed waste facilities, in particular, have posed extreme compliance problems not seen in more traditional, purely hazardous waste facilities. Now, it may be that you can look at the effects and argue, well, of course, the purpose must have been to get at the pure radioactive material. I would say it's an outgrowth of the fact that it is the mixed waste facilities that have posed particular compliance problems that are unique. So, in other words, in looking at the purpose, and it's just like Congress did with the Federal Facility Compliance Act, where it kicked out mixed waste facilities to do certain things that weren't required of all hazardous waste facilities that might be managed by the federal government. It's because of those unique compliance problems posed when hazardous waste is mixed with radioactive material. The problem is, by and large, that's held the hazardous waste component captive and untreated and, frankly, mismanaged for decades. If we disagreed with your interpretation and determined that there was preemption because of the Atomic Energy's exclusive authority or virtually exclusive authority over radioactive materials, would there still be a role in the statute for the Citizen Advisory Board? I think it's arguable whether there would be since the Citizen Advisory Board is set up within the same mixed waste facility scheme that runs throughout those operative provisions. I think they're all tied together. Thank you. Your Honors, I know that we've used a lot of time. If you'll indulge me just to touch on real briefly the three other areas. I think the others are well briefed. I would like you to touch on your view that you started with or one of the points you said, even if we were to disagree with you, that there were one or two or three aspects of the district court opinion that you felt were too expansive. If you would just list those for us. I'd be happy to. First, the way the district court analyzed field preemption with respect to purpose. The district court said, even if we adopt the state's interpretation, we think the real purpose behind this was to get a radioactive material. The PG&E case answers that. It says, where Congress has shown us intent to preserve state authority and there's a legitimate application of that state authority, we're not going to get into a quagmire of looking at whether there's a particular improper purpose behind it. What it would result in this case is, if you apply RFRA's default clean closure standard for tanks, it means get all the material out. If one regulator is thinking solely of hazardous waste, it would be constitutional. If another regulator realizes that an incidental effect of the same clean closure standard is that radioactive material is going to be removed, then arguably it's unconstitutional because of that thought in mind. That's the quagmire that PG&E avoided. Second, the court said, this initiative, even as interpreted by ecology, has direct and substantial effects. It used a couple of examples. One, disposal of mixed waste into unlined trenches. Two, closing tanks and requiring that everything practicable be attempted to remove waste in the tanks. Those are standards that are identical to what's in RFRA today with respect to landfill standards and tank closure. If the court says those are direct and substantial effects, then you can draw a straight line to our existing authority. With respect to Section 5.1, the court, we believe, with all respect, was very simplistic in the way it analyzed preemption. It didn't recognize the role of CERCLA, a later enacted law, that by its plain terms waived sovereign immunity for application of state laws concerning removal and remedial action of hazardous substances. No limitation to carve out radiation. They have to be released into the environment? They are released into the environment, and that's where Section 5.1 operates. With respect to the contract clause, the court conflated a reference to statutory citizenship rights in a letter written by the Department of Justice with an intent to create intended beneficiary status for all citizens in the state of Washington. That greatly expands the ability, well, it has three effects. It impairs the ability of the regulators to enforce what is in essence an enforcement order because now all of a sudden you've said every citizen is an intended beneficiary of a contract. Apparently it was the state that solicited that observation in order, apparently, to encourage citizens to become perhaps more aggressive than the state was prepared to do on its own. And what we believe the state was asking was whether the Department of Justice agreed that this consent order was an order for the purposes of RCRA citizen suit provisions and could be enforced under those provisions. But what the district court finding does is to create an avenue for suit under contract theory that completely avoids all the procedural steps that go with the citizen suit. That greatly expands, it misconstrues the difference between intended beneficiaries and incidental beneficiaries, and it guts existing citizens. How could any citizen be more of an intended beneficiary than those directly affected by the contract in question, the TPA? We don't think they can be more intended. If any citizen is an affected party for purposes of suit under the letter, how is it that somebody more directly affected by the TPA doesn't have a basis to claim intended beneficiary status? I mean, I think ultimately what you have to say is that the intervener isn't an intended beneficiary, doesn't have rights to enforce, but it seems to be a lot closer to the agreement than any citizen in the state is, or at least as close to the agreement. Well, we don't believe that the Tri-Party Agreement intended to create specific intended beneficiaries. And you need to look to the language itself to find clear intent to create intended beneficiary status. We don't believe such intent is there. We believe that the interveners on the other side have the ability to enforce it as citizens through citizen suit provisions, but that is a different legal avenue than a contract theory as intended beneficiary. Thank you. Thank you very much. Before you begin, we'll see if we can have some, the front row needs to just squish, everybody squish a little bit more. I think there's some chairs, a few of the, we have students here from the North Fork School as I understand it, so a few of the students, there is one or two seats there. There's one seat here, there's one here, and we can take a chair here. So one of you can come up here, two of you, don't be shy. The only chance you ever get. You wonder why people are members of the bar, well, that's the bar, and we're going to let you come in here now even though you're not members of the bar. So one person can sit over here. Or a legal bar aide as a matter of fact. Right, any bar. So one can sit behind the castle here. There's two more chairs here. And surely now let's see. We can have one more squeezing going on. We're almost there. All right. There's one more chair here. You can see what the clerk does. He is pretty good from up here. This is our clerk, Stacy Bremner, who keeps track of everything electronically. So, okay, we have all but one, so, or two. Thank you. You may proceed. May it please the Court. Michael Robinson Dorn of the University of Washington Environmental Law Clinic. I represent the sponsors in this matter. If I could, rather than going through the initiative, which I take it, would not be the Court's preference in talking about Section 7 and Section 9 and working our way through Seer Adam, but rather return perhaps to a very fundamental question. And Judge Clifton, I think you were the one who asked it, and it's exactly the right question, which is why are we here? And the answer, I think, has very little to do, surprisingly, with the definition of hazardous substance or how the CPA does or does not work through the various provisions. The state's briefing and ours, I believe, is correct. You take the definition as the Supreme Court gave it to us, and then you see how it applies in the statute. Just as in CERCLA, as Judge McKeown, you have probably the seminal case in this circuit on hazardous waste disposal, does it have to be passive or active? Because tomes can be written out of how these provisions get analyzed throughout. But that's not why we're here. The reason we're here today is because the impact of the district court's decision is simply staggering in its implication. As the state indicated, and they are correct, the existing authority under the Hazardous Waste Management Act would allow each and every one of the activities that the CPA presents as what ecology should do. And you say, well, if you could do it, why haven't you? Don't we have a problem with that? Absolutely. The citizens of the state were very upset. Ecology was not exercising its discretion, and we've told them very clearly, my clients and the people of the state, that they are to exercise that discretion. No question about that. Let's stop there. So it's your position that as a mandatory matter under the existing statutes, if the cleanup isn't going as directed, that the state must stop all incoming shipments, including those that include nuclear components. Is that your position? Not entirely. Why not? Let's start with my question. Why isn't that your position? Because that's how I hear it. You're correct that we're talking about mixed waste. It's very important, and perhaps your question assumes that. It assumes it because I think the CPA is directed to mixed waste. I'm just trying to get as absolutely clear as I can be on this. As to mixed waste, the state could put in a condition under existing law and must under the CPA to have a moratorium against more mixed waste coming to Hanford for disposal. Not treatment. Treatment, section 49 has differently. But for disposal until they're in compliance. As defined by the Supreme Court. That's correct, Your Honor. And what's very important here, and I want to get right back down to Judge Clifton's question, is why does it matter if the existing law allows that? And if the district court's opinion is correct, and the forward lean of the Department of Energy is correct, which is to say that if a state law under its mixed waste authority, which, of course, comes from RCRA, has a direct and substantial impact, it is preempted, then that undermines the Hazardous Waste Management Act. It undermines every state mixed waste law. There is another act, the Atomic Energy Act, which says you can't do it. Absolutely. The Atomic Energy Act, 54, as amended, says that those materials, the radionuclides themselves, are subject only to regulation by, in this case, NRC and DOE, in this case specifically. But the mixed waste, in other words, we have these two inseparable properties, the chemical hazardous waste and the atomic energy. The mixed waste portion, the hazardous waste portion, is expressly subject to RCRA. What if it contains atomic materials? Even if it contains atomic materials, AEA materials, the mixed waste is regulated. The mixed waste portion, the hazardous waste portion, is regulated by the state or EPA under RCRA. Where does it say that? I'm sorry. Well, we have the definition in the FFCA, which is in 6961A, which tells you what mixed waste is. Then we have the history since EPA in 1983 and then I believe in 1986. I hope I'm getting those dates right. I'll supplement if I'm not. We will apply our authority to the mixed waste portion, the hazardous portion, sorry, of the mixed waste. DOE, I think there's no question, did not initially think that was such a great idea. This is not a surprise. DOE has fought this. And so it went through until 1992 when Congress said, no, we absolutely intend for you at the federal government and you federal agencies to be subject to RCRA, the same as any private party. That doesn't seem to solve the problem because RCRA specifically excludes regulation of nuclear waste. Absolutely. What do you say about that? RCRA excludes AEA pure material, but it does not exclude mixed waste and the regulation of the hazardous substance within it. Now, if there is a direct conflict. Stop. I'm sorry. You're talking faster than anyone can think. I notice my time is running down very quickly. Well, we're trying to get to the bottom of this. You're trying to jump the hurdle. Yeah. So your view, you know, you look at RCRA and it has basically an application section that excludes AEA materials. You're now saying that, in your view, RCRA gives authority to the states to regulate hazardous waste that include nuclear materials. Absolutely. And that's the position. The state doesn't take that position as we read their brief. So would you point to me where in RCRA I find the statement, the support for the statement you just made? It takes several steps. But RCRA initially regulates hazardous waste. Hazardous waste and solid waste in particular, the definition excludes AEA materials. Now, when you take the mixture and put it with hazardous substances, hazardous waste, my apologies, the question was, and this went all the way through the early 80s, does that make any difference or does the AEA's exemption keep the Environmental Protection Agency and any other state from regulating? Because if it does, then it's DOE's problem and nobody can touch it. And EPA said, no, that's not the case because it has hazardous substances. That went up into the courts. DC Circuit initially said that's correct. EPA may regulate the hazardous waste component. Now, what the United States says is, yes, but if you do that, and then you're directly and substantially impacting AEA materials, it's preempted. RCRA itself provides for a way to handle this because you have a dual regulatory structure. Okay, so stop there. So that's your argument, but I'm asking you, that's now your gloss on the various statutes. But RCRA itself excludes these AEA materials, does it not? Pure AEA materials, so the radionuclide. What do you mean by pure? The radionuclide. AEA has special source byproduct material. Those are the radioactive materials that the AEA preempts. It doesn't, for example, preempt naturally occurring. This is one of the problems. Source, special nuclear, or byproduct material. So you start with solid waste and then you go down through there. And you say that is not solid waste. So if that's what it is, it's not solid waste. But the question was always, what happens if it's mixed with a bunch of hazardous waste? Does the AEA preemption keep anybody from regulating that? And the FFCA makes very clear, no, it doesn't, unless two things happen. One or two ways this can take place. The first, and I know my red light is on, and I assume it's okay to keep going. The first is, if there is, in fact, a direct conflict, and this is in the legislative history, I believe it's Senator Chafee, I believe, who said, and it's in our brief, if in those few circumstances that by regulating the hazardous waste you are necessarily conflicting with AEA preemption, because AEA preemption includes disposal, then AEA controls. But that in and of itself suggests that you do have this dual... But once you focus on, in this case, the initiative, it's self-focused on mixed waste, which by definition means you've got both pieces, isn't that the problem? In fact, that this particular legislation, whether or both analyzed as purpose or as effect, winds up coming down on the part of the spectrum that's been ruled out of bounds, because it's not going after all hazardous materials, it's going after hazardous materials that happen to have this radioactive component. It's going after mixed waste, which, as you say, is this radioactive combined with. And there's nothing incorrect, unconstitutional, or otherwise prohibited in RCRA or any other statute that says you cannot go after this class. Just like high-level waste... Well, that goes back to the question I posed before, because when you go after that class, it suggests that it isn't the hazardous part that you're motivated by or trying to effect, it's the radioactive part. And what Congress understood, and of course it's Congress's intent that we look to to see if the state, its sovereign powers, police powers are preempted, is that because this is such a special problem, they have unique hazards associated with mixed waste that the state could regulate as to the hazardous waste. And of course that was going to have an impact on the Department of Energy. There was no question about that, and that's why there's also a presidential exemption. So not only do we have the situation where the act says, if in fact there's a conflict, AEA, realizing that mixed waste by itself can't be the conflict, otherwise the statute doesn't make any sense, but then it gave the president an explicit exemption. It said, if in the paramount interest of the United States the president determines that this statute, Federal Facilities Compliance Act or RCRA, should not apply, then he need only say so, and you have a one-year exemption, and it's one year thereafter, and all the president needs to do is report to Congress as to why. So the parade of horribles that you hear works just the opposite way. If we're now going to have the Ninth Circuit say that states may not have a direct and substantial impact upon mixed waste because that would necessarily affect AEA, that undermines the Hazardous Waste Management Act, the other states who regulate mixed waste, and I would argue, and I would very much like to hear what the United States position on this is, EPA's regulation itself, because EPA garners its authority to regulate mixed waste, not from the AEA. It couldn't, and if the AEA preempts the regulation of that material through RCRA, what is EPA doing regulating it? Federal preemption isn't a problem for the EPA. It's federal. Well, preemption is, though, because if RCRA says AEA materials are preempted, you may not use RCRA to regulate AEA materials, and EPA says, well, that's exactly what we're doing. It is what they say, and it's what the Department of Energy has concurred in. How are they doing that unless they, too, believe that you may regulate the hazardous waste aspect of mixed waste? Now, by doing so, yes, you have an impact. I don't want to say that you don't. Of course you do, but that's an impact that Congress understood and explicitly gave to the states. Well, let me ask you, at what point in time would you say that the AEA cuts in, that is, AEA provides the exclusive jurisdiction nuclear safety concerns? Sure. Now, at what point does that cut in to prevent state regulation of mixed waste? So if the state decided to tell the Department of Energy how it ought to come up with a standard for safety for the workers, for how this ought to come out, I suppose that could be a safety issue unrelated to the hazardous substance. I suppose the state says you can't ship any more stuff into the state because it's hazardous. There is a potential, and it is simply a potential, that that could, in fact, be a situation where the state says, you can't bring it because we have authority under RCRA to tell you that. And DOE is able to demonstrate that they have a plan, that that plan is congressionally authorized, and that it's for national security, what have you. That may be the case where you say it's preempted. Isn't that the case? Respectfully, it's not, Your Honor. There is no current plan to bring that waste to Hanford. And what we've asked in our briefing, what we implored the district court to do, is wait for that case. That's the problem with a spatial challenge, is we don't have that case. But aren't there shipments of nuclear waste into the state right now, in and out? There are shipments allowed. In the mixed waste, there are certain exemptions that there's certain mixed waste that are going to Hanford. But then, of course, there's high-level waste and low-level waste that are not included. But there's mixed waste going to Hanford, correct? That is correct. And that's what, or potentially could be shipped to Hanford. And that's what the citizens said they don't want shipped, correct?  So why aren't we here now? I wish we were on a record that would develop exactly that question. Because if the case becomes an as-applied challenge, not to whether or not we can regulate at all, but whether or not, say, the Navy shipments of certain materials to Hanford is barred because there is an actual impossibility, because that's the standard, the applicable standard, then we would have a record upon which to see whether or not that's the case. And the president might actually invoke the exemption, which would avoid a lot of this. And instead, what happens is, if this court were to affirm the district court, the district court's opinion is, you may not regulate in this area. Instead of now going back and either finding, waiting for real conflicts between the two sovereigns, which allows them to engage in their political battles, which they've done for years, which allows... It could be that the parties can figure out how to amend the Act. But there's no party who doesn't believe in this Act who's going to engage in that if they can simply point to a decision that says, it's preempted. All right, let's hear it from the other side. Thank you. Thank you. May I please declare my name is John Bryson on behalf of the United States, and with me at council table is Marlon Marvin from the Department of Energy, Office of General Counsel, and counsel for the intervenors.  and the two intervenors are splitting the remainder of time evenly in five pieces. Would you start where we left off? Because... we now have everyone agreeing, of course, that we're bound by the Washington Supreme Court decision on definition of what mixed waste is, and you now have the sponsors and some degree of Department of Energy, Ecology from the state of Washington saying, but we actually have authority under the existing either RCRA or the Facilities Management Act to have state regulation of hazardous waste that includes radioactive materials. Could you speak into the microphone? We have a little tall. Yes, you can just end it up. So if you would start there and... Is that better, Your Honor? You are the federal government. Thank you. Okay. Well, the... You have to separate the idea of mixed waste that is under RCRA and the current Washington State Hazardous Waste Management Act because the initiative expands the definition, and that's what the state Supreme Court concluded conclusively. And... So the authority that they would try... The federal government's position would be they can't exercise that authority under the Hazardous Waste Management Act, their state counterpart of RCRA either, because it is still... What they would attempt to do would be entering the preemptive field because if they would attempt to make every part of the Cleanup Priority Act effective under the Hazardous Waste Management Act, it would be because they were applying regulatory authority to the radiological component of the hazardous waste mixture. Okay. So would you explain in plain English, if it's possible with these statutes, what radioactive materials may be regulated by states under RCRA and the Facilities Act? Well, the short answer is the state has no authority whatsoever to regulate radioactive... Atomic Energy Act materials, which is all that we're concerned about here. And that's not disputed. And that's not disputed. It's a dispute as to what comes with an umbrella. What is mixed in with hazardous waste as defined? And the answer to that is that because of Congress's decision to reserve exclusively to the federal government authority over the Atomic Energy Act materials, and because of RCRA's definition that mixed waste includes such material, a mixture of such material and hazardous components, that means that we have a dual concurrent regulatory authority being applied to the same mixture. Well, what is the authority to regulate mixed waste that contain nuclear materials? They don't have that authority. They don't regulate the substance... I mean, the category of mixed waste. What they regulate is the hazardous component. That doesn't answer the question. Suppose that there's mixed waste that contains hazardous nuclear materials. Is there any authority to regulate that material given the AEA provision of it? Not as a whole, Your Honor. It's a concurrent regulation, and it's mutually... What the state can regulate and what RCRA... The state's limited because of the AEA. But is there any authority that permits the regulation of mixed materials, mixed waste that contains nuclear materials? Why does the AEA prevent the regulation of that material? What the AEA says is that the state... I mean, I have to take... It's a simple question. Is there any authority? I take issue with that, which I think is a hidden premise of your... You're defining... The authority is extending to mixed waste, what it... And as if that was a complete and whole... For regulatory purposes, a whole unit. But it has two components. It has hazardous waste, and it has radiological. All right, I'm talking about the radioactive material. They cannot regulate the radioactive material, and that's where this case begins. In other words, there's no authority to regulate that material. They can regulate the hazardous component of that mixture. I understand. But what I'm wondering is, where is the authority to clean up Hanford if it doesn't exist in Recre? The authority to clean up Hanford? Yeah. Oh, well, there's multiple authority for cleaning up Hanford. One is the Atomic Energy Act itself. Does it provide for regulation of those materials? Yeah. And that's the foundation of all the Supreme Court cases and the Circuit Court cases, finding that the field is preempted for nuclear safety concerns. Well, I understand that it provides for preemption, but does it give authority to regulate the material? Yes. It gives authority to what is now the Nuclear Regulatory Commission and the Department of Energy to regulate the possession, use, disposal of all that kind of material. Does the EPA have any authority on a federal level to regulate or implement anything to do with radioactive materials? It doesn't have, well, AEA material, not under Recre, it doesn't have AEA material. There are other statutes, and CERCLA applies, and it's EPA that enforces CERCLA because it's a federal law, not state. And, okay, so just to stop for a second, CERCLA covers release of mixed waste, which could include radioactive, is that correct? CERCLA applies to releases of hazardous substances, which is a broader category than waste. But it's defined under CERCLA that could include radioactive materials. That's right. That's a federal statute. That's a federal statute, right. We'll put that over in one little corner. But then, if I understand you correctly, what you're saying is when it comes to RCRA, the states only have authority to manage or regulate the hazardous portion of mixed waste, and the AEA or DOE retains authority as to the nuclear portion. That's correct. So this is what you're calling the mixed concurrent jurisdiction federal state. Right. And the way it's, before the initiative was passed, the way that was implemented was through the RCRA permitting process and the EPA CERCLA authority, and it's memorialized in the tripartite agreement, which is an agreement that only has one state. Let me start with that proposition. And now, because the electorate has spoken loud and clear, ecology has found religion and has decided, well, the agreement it struck before or its apparent acceptance of a certain timetable, that's not going to be good enough anymore. So not with regard to the radioactive material, but with regard to the hazardous, the gunk that they can regulate in mixed materials, mixed waste, what's to stop the state, why is the state precluded from saying no more gunk? What they're precluded, they're precluded because they're overriding DOE's authority, the exclusive authority over the radiological component of the mixture. And the way the tripartite agreement, that was by agreement between the Department of Energy and the state and EPA. Well, forget the agreement, forget the agreement because the agreement can't override what the law is, correct? Well, if the initiative is valid, but we say that the initiative isn't valid, it doesn't give authority. But it's not, you know, whatever it is, this concurrent authority isn't working very well. Oh, well. In other words, the... There is evidence in this record that, you know, some of the tanks have been emptied, the waste has been solidified. There is progress on this front. The, and... What, what, okay, clearly the citizens, you know, without making a decision on whether their beef is legitimate or not, but clearly there's a major concern by the citizens of the state of Washington. If, as you say, that this initiative doesn't, they're not permitted to do what they want to do through this initiative, what is their recourse under the current scheme as you define it? The recourse of the citizens? Yeah. Well, the recourse of the citizens is to oppress the state agencies to try to get a new agreement with the Department of Energy and EPA about how to proceed here. And not to give the ecology a veto over how this cleanup and how the management of waste, which is a nationwide problem here. I mean, what DOE is going through a process of determining whether Hanford is the right, has any defects in preventing it from being used for the disposal of the mixed waste. But it had previously made a determination that in its nationwide plan for managing this enormous complex of leftover radioactive waste from the fence crop. So you're basically saying their remedy is to sue the Department of Ecology? That's a possibility, probably. The federal government? And attempt to, you know, go back to the legislature, attempt to have the legislature change the law, and then see if the state, just to say the hazardous, you know, try to incorporate some of this if it's possible into the Hazardous Waste Management Act. But then again, that would be a state law, which would not have, you know, it would not be in implementation of RCRA because that would have to be approved by the federal EPA. Clearly, the State Supreme Court has said that the initiative definition goes beyond RCRA. We started with the Attorney General asking, well, what would happen if you, in effect, substituted instead of mixed waste, you substituted RCRA material, whatever, without saying what it is? It would just be what it is under RCRA. What would be your position if that were how the legislation is interpreted? Well, there is a fundamental problem that perhaps can be worked to a certain degree in some of the sections, but Section 5, you know, is explicit on its face that it regulates all radioactive atomic energy materials. So it's way outside the scope of RCRA. But if these artificial constructions were adopted, there's really no difference between that and what the court did below, which is to say, you know, this can't be enforced this way because it violates the preemption clause. I mean, at that point, you might as well adjourn on that basis. The other argument made, I believe it was by the sponsor, was that actually you could take a look at federal legislation, the FFCA, and that there's not, the legislative history says there's not a direct conflict there. And if you have this presidential exemption, doesn't that mean that it was intended that you would be able to include mixed waste, you know, when it comes as a single package, so to speak? I mean, that's their argument under the FFCA. Well, the FCCA didn't change the definitions of what's mixed waste. It didn't change the exclusion in RCRA for Atomic Energy Act materials or the way, or the provision in RCRA in 6905 that defines the interaction between the Atomic Energy Act and RCRA. So are there some incidental nuclear materials that are part of mixed waste that are not AEA materials? No, because under RCRA, what's excluded from RCRA, the definition of solid waste in RCRA is the AEA materials. So that's, so that wouldn't come up, and it's not a situation that applies to what's going on at Hanford, for example. Those are all AEA materials, there's no doubt about that, that are mixed in with the hazardous component. And the state then took the position that it actually could now stop additional shipment, or I guess acceptance of shipment of materials of mixed waste under the current regulatory scheme. Do you agree with that? No, because we think that, and what they would say was that Session 4 is now part of the Hazardous Waste Management Act, but it's invalid whether it's part of the Hazardous Waste Management Act or whether it's part of the Cleanup Priority Act. And they couldn't do it under the TPA or that mixed with their RCRA authority? It would be entering the preemptive field. That would be the position in the United States, I would expect. You would expect or you know? I mean, you are here on behalf of the United States. I don't see the difference between, you know, saying Session 4 is now Section 4 of the Hazardous Waste Management Act versus Section 4 of the Cleanup Priority Act. It's still preemptive. There's no authority to do that. Could the state, I'll go back to the terms I used before, throw up a stop sign and say no more bringing in hazardous materials in whatever form, in whatever mixture, including mixture with radioactive materials, AEA materials, and sustain that authority based on its power to regulate or oversee hazardous materials? Well, I don't think so, Your Honor, because you're saying there would be a state regulation that says you can't bring any material into the state. Is that right? Well, in terms of you can't bring it to a site within the state that hasn't solved the problems previously identified. I mean, the current, the CPA doesn't purport on its face simply to say you can't bring it into the state. It's not an anti-intervention, but it says you can't bring it to a site where the problems haven't been solved. Could they say that with regard to hazardous materials generally? Hazardous wastes? Correct. And the key, what I'm trying to get to, of course, is could they do that, if they did that for all hazardous wastes, could they do that for all hazardous wastes, even if they happen to be in a compound or a mixture that includes AEA materials, mixed waste? I don't think they can do that because, well, I can't come back to the fact that it, well, I'm outside the CPA, I understand that, so I'm posing a hypothetical question, but I'm trying to figure out what exactly within the CPA is the problem, and if the state has the authority over hazardous wastes in all hazardous waste forms, including mixed waste, and exercises that authority over all hazardous wastes, I'm not sure I hear the same preemption problem that I've heard from the government on this particular initiative. The question, I guess, would be whether that would be consistent with RIPA, and I don't know that there's anything in RIPA that would allow such a determination that a site that's not completely cleaned up can't operate a separate unit or facility that could accept mixed waste, that separate unit being completely compliant with RIPA. And as to the United States and its facilities, because it's the only, and because it deals with the radiological materials, it would be discriminatory. Well, if they said simply you can't, we have a moratorium now on hazardous waste coming in. Just hazardous waste that's defined under RIPA, would that be a problem? Yes, but I don't think RIPA authorizes a state to exercise RIPA authority to bar the import of hazardous waste. Even if hazardous waste is defined not to be mixed waste? Right. And why is that? Does that go to the Commerce Clause problem, or does that go to a preemption problem? The RIPA, if you satisfy the conditions of RIPA, you can manage hazardous waste. What would prevent a state from simply saying no hazardous waste? Forget RCRA to just say no hazardous waste can come into our state until certain ABCD conditions are satisfied. And hazardous waste is hazardous waste as defined in RCRA and the state Hazardous Waste Management Act. Would that be constitutionally permissible? I think you have to look at what those conditions are. I mean, whether the form is a conditional moratorium or a flat-out ban, you've got to look and see whether those are consistent with your RIPA. And then it creates these Commerce Clause problems. Is it a Commerce Clause problem then, or is it a preemption problem, is what I'm asking? Because if you have all powers not specifically taken by the federal government or left to the state government, why wouldn't, as a general principle, the state be able to do something like that? Is it a Commerce problem then, or does it become a preemption problem if they just said no hazardous waste if you haven't cleaned up a site in compliance with the already existing criteria? I think it would create a serious question, and I don't have a complete answer for you under RIPA, because RIPA sets up a scheme for permitting the management of hazardous waste. And I don't think that scheme – I think there would be a serious question as to whether that scheme could include a complete bar on hazardous waste within a particular jurisdiction. Doesn't RIPA waive sovereign immunity? It waives sovereign immunity for federal facilities. Just federal – well, that would be the – and that sets up the sovereign immunity. It's the federal government's facilities that the waiver applies to. But it also has to be to the same requirements that apply to non-federal facilities. It can't be discriminatory. And it's also limited to, quote, requirements, which creates its own issues of what the waiver extends to. Is there a citizen suit provision under RCRA? Yes. So there could be a suit brought against both the state and the federal government for failure to comply with RCRA? Yes, I think so. Yes, I think that's right. All right. Thank you. I've used that more than in my life. Mike, just wait just a moment. A long-term audience will feel the oral argument sometimes wanes. Perhaps it was the RCRA-CIRCLA acronym. Too many acronyms. Too many acronyms. Your Honors, I'm Colin Deal. I'm appearing on behalf of Floor Hanford. Floor is charged under a contract with DOE with cleaning up one of the most complex environmental cleanups in the world. I think that's undisputed. And DOE determined as part of that cleanup effort that the Hanford site was the best site in the United States for the disposal of so-called mixed wastes. DOE has also determined that other sites are the best site for disposal of other radioactive wastes, like the WIP facility in New Mexico. Hanford is the only site in the country that can accept certain classified mixed wastes and so-called high-activity mixed wastes. And it's only one of two sites nationwide that can accept mixed wastes from federal facilities. To put it mildly, these disposal sites are somewhat limited. There aren't a lot of them in the country. You're addressing the preemption issue, I take it. I should have said this up front, but I'm focusing on the Dormant Commerce Clause issues, although I can touch on some of the preemption issues. I just want to know what you're arguing. I'm really focused on Dormant Commerce Clause. And if I can focus on Dormant Commerce Clause, the CPA was enacted to set up a stop sign at the Washington border to prevent mixed wastes from coming into the state of Washington to be disposed of at Hanford. That's clear from the statute itself, which says that the statute is designed to prevent Washington from being used as a national waste dump for so-called mixed wastes. It's clear from the voter pamphlet that specifically used the term national waste dump. And it's clear from the promoter's materials that were given to the voters before the election was passed. As the district court said in its opinion, decisions which need to be made at a national level addressing national concerns cannot be trumped by protectionist regulations of individual states. I submit that the CPA is discriminatory both in purpose and effect. As I've already indicated, the purpose was clearly protectionist, and the effect is also protectionist. Does that rely on the fact that most of the waste is coming from out of the state? It's undisputed below that virtually 100% of the mixed waste that's disposed of at Hanford comes from out of the state of Washington. And so, in effect, what the proponents in the state have done is cleverly drafted a regulation or a statute similar to the one that was struck down by the Ninth Circuit in the Spellman case, where they're putting up a stop sign at the border of Washington that says none of this mixed waste can come into the state of Washington. And the statute itself, because of its definition of mixed waste, defines mixed waste to include hazardous substances. And hazardous substances is different from hazardous waste under RCRA. And so they are capturing, under the definition of mixed waste, pure AEA materials that they are trying to prevent from coming into Washington. The bar against importation to Washington depends on their not having a final facility permit. That is, if they get a final facility permit, then the bar is lifted. That is correct. It depends on having a final facility permit. Well, can they get a final facility permit? The cleanup at Hanford... Excuse me. What are the conditions? The cleanup at Hanford, Your Honor, is a very complex cleanup. And under the statute, to get a final facility permit, all of the units at Hanford have to be cleaned up before any of this mixed waste can come into the state. And what effectively Washington is doing is saying we're going to dispose of all the Washington waste and clean up Washington first, but we're going to prevent the rest of the country from doing that. Because in order to ship mixed waste into Washington, Hanford's got to be cleaned up first. So all the waste from Hanford can go to WIPP, can go to Yucca Mountain in Nevada, can go to other places out of state, but no waste can come into Washington to be disposed of at Hanford until the cleanup's complete. And the cleanup can't be complete until all this waste is shipped to other places around the country. What if they were to say, well, Hanford is full to capacity and can't receive any more materials? Wouldn't the Commerce Clause permit the state to say no more because we don't have any more facility, no more room in our facility? But the truth is, Your Honor, Hanford isn't full to capacity. In fact... That's a bad question, then, isn't it? Well, I mean, in the record below, there's an exemption in this statute for commercial mixed waste to continue to come into Hanford under the Northwest Compact. And that's run by the state of Washington in a facility in the middle of Hanford. You have to remember, Hanford is a 560-square-mile site. There are a number of units within Hanford. And currently, there's commercial mixed waste that's being disposed of at Hanford. There is the naval exemption that's contained in this statute that allows naval waste from the state of Washington's naval facility to be disposed of at Hanford. But waste from other facilities can't be disposed of at Hanford. And that's what they can't do. You say other facilities. Do you mean other naval facilities? Other non-naval... Federal facilities outside of the state of Washington. Suppose there's something... Pearl Harbor has a shipyard. Suppose they wanted to send something from Pearl Harbor. Could it go there under the naval exemption? You know, on the record below, it's unclear whether there is any waste from Hawaii that makes its way to Hanford through the naval exemption. There may be. But even if there is, it is a de minimis amount of waste compared to the amount of mixed waste that's proposed to be disposed at Hanford under the DOE's plan to clean up these nuclear waste. The state argues that, first of all, it's not illogical for the citizens to say, wait, until we can clean up the situation, we don't want to risk making it worse. And that's not a reason we would agree with that. I would agree with that. So the way they propose to do that is through this initiative. And if, in doing this, if what they're saying is get your... Once you have a final facility permit, you know, then it's okay. But we don't have that yet. So it's not that we aren't going to take any more. It's a timing question, not an absolute exclusion question. Does that change it? I don't think it does change it, Your Honor, because I think the timing here is such that we're not talking about a few years. The cleanup of Hanford, as stated in the record, will last the rest of my lifetime and probably this generation. And to say that we can't bring any waste into Hanford until the entire facility is cleaned up is what I've already said. I mean, it blocks waste at the border under the Commerce Clause. Let me also say that Washington is allowing for the disposal of mixed waste at Hanford as long as that mixed waste comes from Hanford. So that Washington can take mixed waste from a unit at Hanford and dispose it somewhere else in Hanford pursuant to its RCRA authority and pursuant to the various statutes, but it can't take waste from anywhere else, from any other part of the country, and dispose it of it in Hanford. Well, if under the Commerce Clause, if you were trying to excise portions of the legislation that pose this, if that portion were excised, then you wouldn't have the same problem. You wouldn't be discriminating against Washington's continued deposit and out-of-state deposits, correct? When you say that section, you mean the mixed waste? The one that permits Washington waste to be deposited. If you just said, in effect, Hanford is closed until it clings up its act, so to speak. And then we'll begin accepting guests, including Washington. Again, I think your question raises preemption issues, which have already been talked about, whether or not the federal government has jurisdiction in the ADA to clean up Hanford and whether the state of Washington has anything to say about that. But setting aside the preemption piece of the question, still under the Dormant Commerce Clause, there is a more narrow way for the state of Washington to control the problems associated with disposal of mixed waste at Hanford. And the flow control cases, which are cited in our brief, say that repeatedly, over and over again. The state can pass a more narrow regulation. It can use its environmental regulatory authority to try to make sure that the disposal that's done at the Hanford facility is the best disposal possible. What it can't do, however, is it can't say, we're not going to take any waste from anywhere else outside of the country. And because Hanford is only one of two locations in the entire United States that can accept this mixed waste, that's essentially what they're doing here. Regardless of what they call it, that's what they're doing here. I think my time is up, unless the panel has other questions. Thank you. Thank you. May it please the Court, good morning. Good morning. Matt Siegel from Kirkpatrick Lockhart, Preston Gates, and Ellis for Tridex. I intended to focus primarily on the Contract Clause and the Cross Appeal. And I hope that the Court will indulge me a moment at the end to do that. But I did want to focus on some of the points that the Court has been raising today, and particularly coming back to Judge Clifton's question of why are we here, and answer that by suggesting to the Court why we are not here. We are not here because the state enacted new hazardous waste regulations. In fact, I feel confident that if the state had, or the initiative proponents had put forward the Hazardous Waste Cleanup Priority Act, that I would now be at home bailing water out of my basement instead of before the Court. Initiative 297 is about radioactive waste. Let's not forget that Section 5, for example, regulates pure AEA materials. I don't think there's any dispute about that. The definition of mixed waste in Initiative 297 is exceptionally broad and encompasses any number of radioactive materials, including indisputably AEA materials. I think we've already pretty well established that, and then it's a question of how does that flow through the statute. I believe that that question was also answered, in part at least, by the state Supreme Court's opinion, despite the state's suggestion that it was not. Because following the certification sub-questions regarding the definition of mixed waste, the last question was, in light of the Court's answers to subparts A through C above, does the definition of mixed waste expand the scope of materials regulated as mixed waste under the Washington Hazardous Waste Management Act? Answer, yes. In other words, the state Supreme Court found that the definition of mixed waste necessarily expanded ecology's authority under the Hazardous Waste Management Act. Moreover, the stated purpose of Initiative 297 was to use that definition to stop additional AEA materials from coming into Hanford. Again, that's exactly what the state Supreme Court said. It said it expands the scope of regulated materials to prevent the addition of new radioactive and hazardous waste to the Hanford Nuclear Reservation. That, again, is in the certification opinion. Now, it's true that RCRA grants hazardous waste authority, but it also, under Section 6905, and I think this is critical, specifically says nothing in this statute impacts the AEA. In other words, if there is any conflict between those two provisions, the AEA must control. And other courts have addressed what that means in the context of mixed waste. We cited that in our briefing, but the United States versus Kentucky decision is one example from the Sixth Circuit. Brown versus Kerr-McGee is another circuit decision that addressed that question. And essentially, the answer is, if the two components are joined together and can't be separated, then in that circumstance, the mixed waste cannot be regulated under RCRA authority by the state. And in the record, in this case, it is also undisputed that the components are inseparable. The Goswami Declaration and the CUSAC Declaration in the record both testified that the mixed components cannot be separated. So, therefore, there is preemption, and that should be or can be the end of the inquiry. Well, is there statutory authority to regulate the cleanup of such waste? I know it's preempted. Yes. Is there federal statutory authority to regulate the cleanup and to require and authorize the cleanup of such materials? Is Your Honor asking about the CERCLA argument? No. Is CERCLA the only statute that would provide for that? I don't believe that there is any authority from the federal government directed to the state saying clean up these materials. Not to the state, to itself. In other words, is there authority for Congress to appropriate funds for the cleanup? In certain circumstances, that would not necessarily apply here. For example, you could use CERCLA authority to clean up radioactive waste that had been released under Section 120 of CERCLA, but only if the site were not on the national priorities list, and Hanford is. And, of course, that doesn't help many of my clients at TRIDEC because we're not federal facilities, and so Section 120 doesn't apply to us. So I would say that, no, under that circumstance, there would not be authority, and certainly that would not grant the state, in turn, authority to exercise its jurisdiction over those facilities. I understand that. That's not the question. Yes. I think that the question is, beyond CERCLA, is there any legislation? CERCLA is a federal regulation, federal authority. Is there anything else on the federal level? I agree with the United States that the AEA, in turn, has some authority that's directed toward the cleanup of radioactive materials and that there are cases that talk about the AEA's preemptive effect, including the cleanup of radioactive materials, and some of those cases are cited in the United States. Is there anything that directs them to do it? Under the AEA? No. I mean, it's great to say they have the authority. The problem is we're sitting here in the state of Washington with the problem. So is there anything other than their preemptive authority that directs them, you know, with all deliberate speed to do this? Well, if you're talking now about the specifically as applied to the state of Washington. No, federal government, federal government. Well, suppose the local office in the AEA decided to enter into a contract for the cleanup of hamsters. Do they have authority to enter into a contract to clean up hamsters? Yes, and they have, in fact, entered into such a contract. Where is the authority in the AEA? CERCLA and RCRA. RCRA for the hazardous waste, CERCLA for the other components, as well as other inherent federal authority to enter into a consent decree. For a federal cleanup? For a federal cleanup and, in part, a state cleanup, there's a division of labor under the Tri-Party Agreement, and that's how it's specified. And that's why we've argued that the Tri-Party Agreement is the appropriate mechanism for the cleanup to go forward. And the district court agreed with that and said, in fact, that the initiative impairs the Tri-Party Agreement because it interferes with the milestone process, interferes with the tank-closing process. These are just examples, but these demonstrate that there is a very specific timetable and a very specific division of authority that's been agreed to between the state and the federal government, and that is what should dictate how it proceeds, not an initiative that is also preempted. Finally, if I may, I just wanted to briefly touch on the cross-appeal arguments with respect to the Section 1988 claim. TRIDEC did prevail below on every claim that it asserted. It obtained a judgment on the merits. The district court denied all relief under Section 1988. I'm not aware of any case that states that a party that obtains a judgment on the merits on every single claim that it brought, including multiple claims that are cognizable under Section 1983, cannot be considered a prevailing party under 1988. Let me just ask you this. It's kind of an odd situation because I read the district court and it's basically saying, well, there's preemption, and that's the end of the story, but just to tidy things up and to make sure we don't have a piecemeal in the Ninth Circuit Appeals, I'm going to also tell you my answer on everything else. Does that change it in terms of if we were to hypothetically agree with the district court on its first point on preemption and the federal government has adequately brought that to our attention and briefed that, where does that leave your client? Just so I understand the court's questionnaire, are you asking if the court affirms solely on preemption grounds under 1988? And also said that nothing else was necessary to get to that point. Would you then be a prevailing party? I believe we would, and I think there are a couple of components of that analysis. With respect to the affirmance on appeal, I think that would be governed by this court's decision in Gerling v. Garamendi, which is that if you prevail below on claims and then the next court up makes a determination, which is more appropriate at the appellate level than the district court level, that we don't need to reach every claim to affirm what was decided below, then fees can still be awarded. Now, there's a potential question of amount there, and that probably would be something to resolve on remand, but that's, I think, the crux of Gerling. Now, the other question is even if, for example, the district court had made that decision or if you made a determination that the district court should not have reached those issues, I still believe that under Gerling and under Dennis v. Higgins and other authorities cited in our briefing that if a number of claims were presented and only one was decided or only two were decided but not all of them, there's still an entitlement to fees. And again, it's a question of amount there, but the entitlement is based on the fact that if you're asserting constitutional claims and you don't decide all of the so-called fee-generating claims but you decide another claim, that you still are a prevailing party. And so in that circumstance, again, it would be something that should be handled by the question of the amount of fees but not a complete deny or a complete across-the-board finding that you're not a prevailing party as a matter of law. Thank you. Thank you, Your Honor. I think we've very well exhausted the preemption analysis, so you have two minutes. You're welcome to go back and revisit anything, and if you would make a brief comment at the end with respect to the attorney's seat, that would be helpful. Thank you. I did want to focus on one aspect of the preemption discussion. First, I think that if you take statements made by the federal counsel, myself, and the sponsors' counsel, we're all in agreement in a certain sense on mixed waste. It's one material. It's inextricably intertwined. We have state regulation going to hazardous waste. To the extent there's hazardous waste, the state regulation extends over the mixture as a result of that hazardous waste. And I think counsel for the sponsors may have misunderstood a question from you, Judge Hortzer, with respect to the reach of the Section 4 limitation. We read that to affect waste that is mixed with hazardous material coming into the state under, as we see it, the Hazardous Waste Management Act authority. But the question is, so where does that leave us? What is the scope of state authority? And, Judge Clifton, your questions were, I think, right on step with what we are trying to argue here, which is the Hazardous Waste Management Act includes everything up to the power to revoke a facility permit entirely based on noncompliance. So within that broad authority, there is the lesser included authority to craft specific permit conditions to account for particular compliance problems at a facility. And I want to make it clear, this law is focused on problem facilities. It's not saying waste stops at Washington's borders. It doesn't matter where the waste comes from at all. It matters where it goes. Well, the problem, though, we all know what facility is aimed at, and that facility happens to be the facility that includes materials that fall within the AEA. And so I hear what you're saying, and I think there's a lot in terms of what the state can do, but it's running right up against the wall that Hanford is Hanford. And the reason Hanford is viewed as special by everybody is not because of the other kinds of hazardous waste material there. It's because it's the nuclear dumping ground for much of our nation's radioactive waste. So what can the state point to to say that, well, no, it's not really that purpose or that effect that's attached to I-297? I think, in the end, that's what I-297 is all about. Well, I suppose Washington has the good fortune to have one Department of Energy facility. There are other states, such as New Mexico, that have two. And what I'm concerned about is the rationale used to analyze this, because in New Mexico, if you have one facility that's contaminated and one that is compliant and not contaminated, does that mean that New Mexico would be precluded from focusing a law on the contaminated facility to get it cleaned up before more waste is added to the problem? The fact that there's another facility available would mean you don't have the same Commerce Clause issue. Right, but you might have the same preemption issue. I have a Commerce Clause issue. But what I'm encouraging you, for the Commerce Clause purposes, is the fact that we do have one facility shouldn't rule the day. What should rule the day is, as we analyze spatially nondiscriminatory legislation, do we have a state problem here? And if so, then under PIKE, you go to the next step. Are the burdens clearly excessive? The answer is no. So going back to the preemption issue, it is within RCRA, as an authorization matter, sets a broad framework. It says the state has to have certain authorities. As I said a moment ago, those authorities include the power to revoke a permit entirely and to craft conditions specific to a facility. This initiative does just that. We heard counsel for the federal government say one of the options here was for the citizens to go and change the Hazardous Waste Management Act. That's exactly how we read the initiative to operate here in pointing over to that act and telling us how to exercise our discretion under it. If the state believes that, they could start tomorrow. Well, today, actually. Correct? Well, in part, we're waiting for a ruling from this court. Why wait for us? I mean, in other words, we're right back where we started is if the state has this authority under the Hazardous Waste Management Act to impose certain permit conditions or believes it does, and the Department of Ecology hears the citizens who enacted Act 297, then it seems like you ought to rush right back to Olympia and consult with your client on this. There's nothing stopping them under the district court, is there? Unless you look at the analysis used by the district court and you read it in a broad manner, and that's part of our concern today, we want to make sure that this court thinks very carefully about how these issues are analyzed because our state authority over hazardous waste applied everywhere in the state, but in particular at Hanford, is precious, and we don't want to lose that authority. And all we're saying is exercise your authority. Does DOE, Department of Ecology exercise the authority? It has. It hasn't apparently even done that, or we wouldn't have probably had the initiative. There wouldn't have been the impetus for the initiative. Would you just briefly address the attorneys fees? I will. First, if you accept our interpretation of the initiative on the contract clause issue with respect to the private contracts, there is no issue of impairment because the initiative wouldn't breach the materials that they say are affected. But with respect to the standard of review, the clearly erroneous standard has been applied by this circuit. There's the BSA and the Garing case. These cases have not been overruled. We believe they're still good law. But even if you move past that, what the district court focused on was whether there was relief here that materially altered the legal relationship, and it focused on the Farrar case from the U.S. Supreme Court. I've got the Farrar case, and there is language that's directly on point with our case here, at 506 U.S. 113. And speaking of another case, Garland, the court wrote, in that case, the district court declared unconstitutionally vague, a regulation requiring, et cetera. We suggested that this finding alone would not sustain prevailing parity status if there were no evidence that the plaintiffs were ever refused permission to use school premises during non-school hours. The fact here is that the state never interpreted the initiative to apply to these contracts. And despite being outside the scope of the temporary restraining order and agreed injunction from the district court, which applied to federal facilities, the state could have applied it and chose not to. This is a case where TRIDAC came into court, argued for a more expansive interpretation than the state process, and then once that interpretation was adopted, said, see, we've vindicated our rights. There was no material difference from that result. Thank you. The district court never reached those. I want to thank all the parties for your argument and your briefing. It's been very helpful and very extensive. The case of United States v. Manning is submitted. There's no further rebuttal. Thank you. All rise. This court is adjourned.
judges: McKeown, Clifton, Schwarzer